[No. 37887. Department One. October 21, 1965.]

JOHN ROBERTSON et al., Appellants, v. FRED C. BINDEL et al., Respondents.*

R. L. Greenwood and Joe McAdams, for appellants.

John R. Lewis, for respondents.

BARNETT, J.†—This is a rescission action brought by plaintiffs (appellants) to recover the sum of $70,326.36 and interest, less the reasonable value of the use of the property. The complaint alleges that, on March 15, 1960, the parties entered into a real-estate contract for the sale and

*Reported in 406 P.2d 779.

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

purchase of certain land with improvements, notably a tavern, situate in Grant County, Washington.

It is further alleged that, on September 5, 1963, the plaintiffs were in possession of the property (hereinafter referred to as the tavern) and that, although plaintiffs were not in default of any of the terms of the contract and had received no notice of default from defendants (respondents), the defendants entered the premises and took possession. It is claimed that the defendants removed all of the cash and checks in the approximate sum of $1,726.36.

It is further alleged that defendants by their conduct rescinded the contract and that, on the date of the rescission, plaintiffs had paid $68,000.

Defendants' answer by way of affirmative defense asserts that plaintiffs abandoned the tavern and plaintiffs were in default under the terms of the contract.

Although only one real-estate contract is mentioned in the pleadings, two are involved in this action. Both were received in evidence without objection and the pleadings will be deemed amended to conform to the proof. *Moar v. Beaudry*, 62 Wn.2d 98, 381 P.2d 240 (1963).

The action was tried to the court without a jury. The trial judge found, *inter alia*:

> That on the morning of September 6, 1963, the Plaintiffs walked out of said premises and surrendered and abandoned the premises to the Defendants. Finding of Fact No. 9.

> That on the 30th day of April, 1960, the Plaintiffs and Defendants entered into a Real Estate Contract for the sale of a house at 1110 Skyline Dr., Moses Lake, Wash., which was tied into the tavern Contract, in the sum of Fifty Thousand and No/100 Dollars ($50,000.00). Finding of Fact No. 4.

> That Plaintiffs voluntarily surrendered and abandoned the premises to the Defendants. Conclusion of Law No. 1.

The court entered a judgment quieting title to both pieces of the real estate in Fred C. Bindel and Marjorie H. Bindel, husband and wife.

The assignments of error all relate to the findings of fact and conclusions of law of the trial judge.

■ The issues in the case being wholly factual, we proceed upon the well-settled rule that when the findings of the trial court are supported by substantial evidence, this court will not disturb them on appeal. *Hewitt v. Spokane, Portland & Seattle Ry.*, 66 Wn.2d 285, 402 P.2d 334 (1965); *Harris v. Rivard*, 64 Wn.2d 173, 390 P.2d 1004 (1964).

A summary of the evidence upon which the findings of fact are based is as follows: The defendants owned a tavern in Moses Lake. John Robertson was a soldier stationed at the Air Force base at Moses Lake; Bonnie Robertson, his wife, was employed by defendants to work in the tavern and ultimately she became manager; John was also employed to do maintenance work when off duty at the air base. During the period Bonnie managed the tavern business, the Robertsons received $800 a month. The business prospered, and, while Bonnie managed the tavern, the profits amounted to approximately $10,000.

The defendants desired to move to California and consequently sought to sell the business. On March 18, 1960, plaintiffs entered into a contract wherein plaintiffs agreed to purchase from defendants the tavern property for $120,-000. Pertinent portions of that contract follow:

1. PURCHASERS in this contract are purchasing Fred's Tavern and Fred's Hotel located at 214 East Broadway, Moses Lake, Washington, and it shall be their responsibility to keep said business open at the same hours as is customary for taverns and hotels in the City of Moses Lake, Washington.

. . . .

4. PURCHASERS shall be responsible for the accounting of all monies received and all disbursements that shall be made; said accounting and disbursements are to be made on a weekly basis.

5. PURCHASERS are expressly forbidden and agree not to make any credit purchases of any kind; that they shall operate this business on a strictly cash basis.

6. It is further agreed that a weekly reserve shall be set up to pay all taxes, interest payments on principal, business interruption insurance, casualty and fire insurance, and license fees as they become due, in the sum of

Five Hundred Thirty Dollars ($530.00), plus or minus any increase or decrease in taxes or license fees.

7. A complete inventory and full accounting shall be taken monthly . . . .

8. It is understood that all the books in regard to the accounts shall be audited weekly, monthly and annually as required for tax and general information purposes.

9. In the event any of the terms of this agreement are violated, SELLER may terminate this contract immediately and take over the operation of said Tavern and Hotel.

Defendants also owned a house in Moses Lake. On April 30, 1960, the plaintiffs agreed to purchase the house for $50,000. The two contracts became interrelated by the following provision in the house contract:

In the event that the PURCHASERS who are purchasing Fred's Tavern and Hotel, as set forth in one certain Real Estate Contract entered into between the aforesaid parties, dated March 18, 1960, should default under said contract, it shall automatically constitute a default under this contract. Said Contract is heretofore made a part of this Agreement by reference thereto.

Although there is a recitation in the tavern contract " . . . of which $10,000 has been paid," no money was, in fact, paid by the Robertsons. Bindel credited on the contract the $10,000 profit which the business had made while Bonnie was manager.

No down payment was made on the house contract. The only stipulation for payment is that "$350 or more shall be due and payable on or before May 1, 1960, and $350 shall be due and payable on or before the first day of each and every month thereafter."

The parties combined the payments on the tavern and house contracts and elected to have the installments paid each week in the sum of $350, commencing in May of 1960; $230 of this weekly payment was allocated to an account to meet insurance, taxes, licenses, etc. When the business was transferred, the Bindels left approximately $2,000 in this account.

The weekly payments were made by the Robertsons until approximately May of 1963, when they reduced the payments to $250 a week. The business had deteriorated, due to a decrease in employment in the Moses Lake area.

The Robertsons telephoned Bindel in California to apprise him of the reduction in payment. Bindel protested and requested that, if at all possible, the $350 weekly payments should be made.

In May, Mr. Bindel came to Moses Lake from California and, in checking, found the reserve account in arrears and other noncompliances with the stipulations of the tavern contract. The Robertsons were cautioned to bring the payments up and if they could not, that was the time to so state. Although John Robertson stated, "If you want those . . . payments, give him the keys," Bonnie assured the Bindels she could do it. In the next statement, the Bindels discovered the payments had not been raised.

The Bindels called the Robertsons again in June and in August and told them it was necessary to keep their payments up to date in accordance with the terms of the contract.

On September 5, 1963, the defendant Fred Bindel and his son, Fred Bindel, Jr., came again to Moses Lake. Their testimony in brief is that they entered the tavern on September 5th, and discussed the violations of the contract with Bonnie and John Robertson; that the discussion was to the effect something had to be done and they would see if they could help out in cleaning up the premises and in operation of the tavern while they were there; that one of the keys to the premises was given to Bindel, and he and his son helped Bonnie in the operation of the business during the day of September 5th. On that date, Bonnie informed the Bindels that there were approximately $5,000 in bills against the tavern and that they could not raise the amount of money to pay the bills nor the money to fulfill the terms of the contract. At approximately 1 o'clock in the morning of September 6, 1963, Bonnie Robertson took the liquor license off the wall and left the premises.

The next day plaintiffs brought this action.

The evidence is undisputed that the payments were reduced, but plaintiffs' version is that they were accepted and, although there were withdrawals from the reserve account, that it was maintained. Plaintiffs claim when defendants came from California on September 5th, defendants stated the payments were not sufficient and that they were going to take the tavern back and that they wanted the keys, as the bank was going to foreclose; that Bonnie Robertson stated she wanted to at least operate the place over the weekend. She testified that Mr. Bindel said that he had a mortgage company which would buy his contract if she could get the money by Monday. Bonnie told him he could *not* operate under her name and Bindel said that he would have to until the license was transferred. Bonnie testified that she worked some on September 5th, and that, around 12 o'clock, took the license.

Robertsons contend that Bindels breached the contract by interfering with the right to quiet enjoyment and peaceful possession, hence the court was in error in quieting title in the defendants and in failing to find that Fred Bindel's conduct of September 5, 1963, was, in fact, a rescission by the defendants.

Plaintiffs argue that the defendants' rights under the contracts were limited to the giving of notice of default and a reasonable time within which the plaintiffs might correct the claimed defaults, saying in their brief, "It is undisputed that delinquencies by the plaintiffs had been continuing for at least six months prior to September 5, 1963." Plaintiffs assert that defendants, by accepting the payments after the due date, waived strict performance of the contract and hence the contract could not be forfeited without notice and an opportunity given to perform. They cite *Knowles v. LaPure*, 189 Wash. 456, 65 P.2d 1260 (1937); *In re Horse Heaven Irrigation Dist.*, 19 Wn.2d 89, 141 P.2d 400 (1943).

The trial court, however, found the plaintiffs had abandoned the contracts and, if that finding is supported by substantial evidence, the "giving of notice of default and reasonable time to correct the same" is not required.

In *Crook v. Tudor*, 28 Wn.2d 289, 182 P.2d 740 (1947), where the purchaser under a real-estate contract abandoned the premises at a time when the vendors were wholly without fault, we held that no notice of forfeiture was necessary and the vendors were entitled to have title to the property quieted in them. In that case, as in the present one, the purchaser brought an action to rescind a real-estate contract on the ground that the vendor had retaken possession of the property. We held that the evidence sustained the finding of the trial court that the purchaser had abandoned the premises, and that the vendors were justified in believing that such was the case.

In 68 A.L.R.2d 581 at 585, 600, in an annotation as to what constitutes abandonment, it is stated:

> While there are a number of cases in which the vendee's default in the payment of principal or interest was not regarded as an abandonment of the land contract by him, under the circumstances present, there are many cases in which such default was an important factor in the determination that he had abandoned the agreement. Likewise, in a majority of the cases the vendee's failure to pay taxes or insurance, where he was obligated to do so, has been regarded as tending to show his abandonment of the contract of purchase.
>
> Voluntary abandonment of the premises by the vendees under a land contract, and their default in payments on the purchase price and of taxes, constituted an abandonment of the contract.

It is true we said in *Parchen v. Rowley*, 196 Wash. 340, 344, 82 P.2d 857 (1938), that the vendee's statement while in default that he could not pay the balance due "cannot be construed as . . . a declaration of abandonment" where he remained in possession through a tenant, but we also said, "Had the statement been accompanied by surrender of possession of the property, a different situation would be presented."

Testimony shows that the plaintiffs were in default under the terms of the contract as follows: (a) the insurance was not paid in the sum of $600; (b) the bills were not paid in the sum of $1,400; (c) real and personal property taxes

were not paid in the approximate amount of $400; (d) amusement taxes from October, 1962, to September 6, 1963, on 10 per cent of the gross income, were not paid; (e) purchase payments were not paid in the amount of $2,070; (f) water was coming through the roof of the premises, constituting waste; (g) unlawful spending of moneys in the reserve account, and debit memorandums not paid in the sum of $5,779.96; (h) the plaintiffs reduced the weekly payments; the defendants protested and were assured the payments would be kept up, but they were not.

In our opinion, the evidence amply supports and warrants the findings of fact and conclusions of law. We note that in the findings and conclusions the court uses the term "abandoned the premises to the defendants" instead of "abandoned the contracts" but when we review the conclusions of law in their entirety, we see that the trial judge from the facts as found by him concluded that the plaintiffs had voluntarily abandoned the two contracts in issue and in electing such abandonment had, as a matter of law, forfeited their rights thereunder.

It is suggested for the first time in the Robertson's reply brief that there is no evidence in the record with respect to occupancy of the house, surrender or abandonment thereof or to the status of the contract concerning said house. It should be noted that the tavern contract is made a part of the house by reference and should there be a default under such contract, it should automatically constitute a default under the house contract. No initial payment was made on the house contract and payments on the same were included in the weekly $350 payment.

Absent evidence that plaintiffs surrendered the house is not a *sine qua non* that the house contract was abandoned. The surrender of the tavern premises was a link in the chain of evidence showing that the two contracts had been abandoned and the court was justified in finding and concluding from all the facts and circumstances of this case that they had been abandoned.

Judgment affirmed.

ROSELLINI, C. J., DONWORTH, OTT, and HALE, JJ., concur.